6 P.3d 1072 (2000)
2000 OK CIV APP 56
In the Matter of M.B., C.B., and T.B., alleged deprived children.
State of Oklahoma ex rel. Department of Human Services, Appellee,
v.
Laura Bateman, Appellant.
No. 93,414.
Court of Civil Appeals of Oklahoma, Division No. 4.
March 28, 2000.
SuAnn Carlson, Assistant District Attorney, Oklahoma City, Oklahoma, For Appellee,
William R. McKinney, Assistant Public Defender, Oklahoma City, Oklahoma, For M.B., C.B., and T.B.
Kristie D. Scivally, Lopez & Scivally, Oklahoma City, Oklahoma, For Appellant.
Released for Publication by Order of the Court of Civil Appeals of Oklahoma, Division No. 4.

*1073 MEMORANDUM OPINION

GOODMAN, C.J.
¶ 1 This is an appeal from a district court order entered on a jury verdict finding the parental rights of the natural mother of three minor children should be terminated based upon the mother's heinous or shocking abuse of one of the children, and her criminal sentence and incarceration for the abuse. Based upon our review of the record and applicable law, we affirm the order.

I
¶ 2 On October 21, 1995, appellant Laura B. gave birth to a baby girl, M.B. Shortly after birth, M.B. was diagnosed with retinoblastoma, a cancer of the eye she inherited from her father, who had lost an eye to the disease and whose mother and sister had died from it. M.B. began a monthly combination laser/chemotherapy regimen which required a surgically implanted "central line" with an external point of entry for the chemotherapy. Between 7 and 10 days after chemotherapy, it is common for a patient to have a low blood count and be extremely susceptible to infection. If such a child also develops a fever, the child is automatically admitted to the hospital for observation and treatment.
¶ 3 M.B. was admitted to the hospital in mid-March 1996, and released. On April 3, 1996, the mother took M.B. to the hospital for a blood count after the child had developed a fever. The mother was told to check back for the lab results. However, at approximately 11 p.m., the mother took M.B. to the emergency room reporting that M.B. had had seizure activity and had bled from the central line, which had broken. The child was extremely ill and had a diaper rash with a yeast infection. The emergency room doctors feared she may be septic because her blood counts were precipitously low. M.B. was admitted to the intensive care unit. Comparing the blood count taken earlier in the day with the one taken upon admission to the hospital, emergency room doctors concluded that there had been a gross contamination of the central line probably at the time it was broken. The central line was removed and M.B. remained in intensive care until April 7, when she was moved to the pediatric hematology/oncology unit known as 3G. Once there M.B. again developed a fever, and had changes in the color of her skin, spasms of her hands and feet, and episodes of breathing difficulty. She was returned to the ICU. Extensive medical testing could not identify *1074 any cause of M.B.'s worsening and fluctuating condition.[1]
¶ 4 The mother stayed with M.B. throughout her hospitalization, often living in M.B.'s room. M.B. improved and stabilized and was returned to 3G April 9. Approximately 2 hours later, the mother reported that M.B. was having difficulty breathing. The nurses on staff feared M.B. was in cardiac or respiratory arrest and summoned an emergency team which could not re-establish breathing without intubating M.B. with an endotracheal tube and administering 2 rounds of "code" drugs. M.B. stopped breathing on a second occasion and had to be revived.
¶ 5 On April 23, M.B. had improved, and her treating physician was considering releasing her when a nurse entered M.B.'s room and noticed something suspicious with both the color and amount of intravenous fluid being administered to M.B. The mother was in the room and just about to leave to do laundry. The nurse turned off the machine and removed part of the unit and its contents for testing. The results suggested the intravenous fluid had been contaminated with adult human urine.
¶ 6 On April 26, 1996, during a videotaped interview with police investigators, the mother confessed to intentionally contaminating the IV fluid with her own urine. The State of Oklahoma filed a petition April 30, 1996, alleging that 6-month-old M.B. and her 2-year-old sister, C.B. were deprived children due to shocking or heinous abuse of M.B. The alleged abuse included "placing urine in the child's intravenous feeding bag, inserting a syringe into the intravenous feeding tube and sabotaging the child's medical treatment." The mother entered a nolo contendere plea to charges of child abuse and was sentenced to 20 years, with all but the first 10 years suspended. The petition to terminate the mother's parental rights was later amended to include T.B., a son who was born in May 1997, while the mother was incarcerated with the Oklahoma Department of Corrections serving her sentence for the abuse of M.B. The amended petition asserted as an additional basis for terminating the mother's parental rights that she had been convicted of abusing M.B. and was incarcerated for a term of not less than 10 years.
¶ 7 The trial court held a jury trial May 18, 19, and 20, 1999, at the conclusion of which the court entered judgment on the jury's verdict terminating the mother's parental rights to the children. The mother appeals.

II
¶ 8 The mother first contends the State "failed to introduce any evidence that the physical abuse of M.B. was heinous and shocking warranting a termination" of her parental rights to her children. She admits that it is "undisputed" that she "placed urine into the I.V. unit of M.B.," but argues that M.B. "suffered no life threatening injuries as a result of that incident." Consequently, the mother contends the State failed to introduce evidence of heinous or shocking abuse. We disagree.
¶ 9 In this matter, the State sought termination pursuant to 10 O.S. Supp. 1995, § 7006-1.1(A)(6)(a), and (A)(8),[2] which state:
A. The finding that a child is delinquent, in need of supervision or deprived shall not deprive the parents of the child of their parental rights, but a court may terminate the rights of a parent to a child in the following situations:
. . . .
6. A conviction in a criminal action pursuant to the provisions of Sections 1021.3, 1111 and 1123 of Title 21 of the Oklahoma Statutes, the laws relating to child abuse and neglect, or a finding in a deprived child action either that:

*1075 a. the parent has physically or sexually abused the child or a sibling of such child or failed to protect the child or a sibling of such child from physical or sexual abuse that is heinous or shocking to the court or that the child or sibling of such child has suffered severe injury as a result of such physical or sexual abuse, or
. . . .
8. A finding that all of the following exist:
a. the child has been adjudicated deprived, and
b. the custody of the child has been placed outside the home of a natural or adoptive parent, guardian or extended family member, and
c. the parent whose rights are sought to be terminated has been sentenced to a period of incarceration of not less than ten (10) years, and
d. the continuation of parental rights would result in harm to the child based on consideration of the following factors, among others: the duration of incarceration and its detrimental effect of the parent/child relationship; any previous incarcerations; any history of criminal behavior, including crimes against children; the age of the child; the evidence of abuse or neglect of the child or siblings of the child by the parent; and the current relationship between the parent and the child and the manner in which the parent has exercised parental rights and duties in the past, and
e. termination of parental rights is in the best interests of the child.
¶ 10 In an action to terminate parental rights, DHS must support its case by clear and convincing evidence. Matter of D.D.F., 801 P.2d 703 (Okla.1990) cert. denied 500 U.S. 922, 111 S.Ct. 2027, 114 L.Ed.2d 113. "Clear and convincing evidence" is defined as "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegation sought to be established." In re C.G., 1981 OK 131, 637 P.2d 66, 71 n. 12 (Okla. 1981). If any competent evidence supports the jury's verdict, we will not disturb its verdict and judgment based thereon unless shown to be contrary to law. In re T.R.W., 1985 OK 99, 722 P.2d 1197.
¶ 11 It is undisputed that the mother intentionally injected her own urine into M.B.'s intravenous fluid. The fact that an alert nurse intervened before the urine could enter the IV line and potentially harm M.B. does not diminish the shocking, heinous nature of the mother's action. The State presented extensive, and compelling, competent evidence on which the jury could conclude that the Mother repeatedly acted to compromise the well-being of M.B, and indeed jeopardized not only M.B.'s recovery, but M.B.'s life. On two occasions M.B. had to be revived by a medical emergency team. At trial, one of the two detectives to whom the mother confessed testified the mother's actions fit the "checklist" for Munchausen Syndrome by Proxy, a condition in which a family member, most frequently the mother, intentionally, albeit surreptitiously, harms the child or exaggerates the child's condition in order to receive sympathetic attention.[3] The jury saw the videotaped interview during which the mother confessed to harming, and attempting to harm, M.B. The relevant statutes permit termination of an abusive parent's parental rights to the siblings of a child which has been subjected to shocking or heinous abuse. We find competent evidence supports the jury's verdict, and the judgment entered thereon, to terminate the mother's parental rights to M.B., C.B., and T.B.

III
¶ 12 The mother argues that the State's alternative legal basis to terminate her parental rights  her conviction and resulting incarceration  is tainted because she did not knowingly enter her nolo contendere plea. We agree with the State that this is *1076 not a proper forum to contest the plea. The record before us contains the plea, which is not facially deficient, and therefore is impervious to further review.

IV
¶ 13 At the conclusion of the first day of trial, the trial judge's bailiff handed the judge a motion which had been forwarded to another judge. The motion was signed by the mother, and was entitled Motion for Appointment of Counsel. An affidavit was attached to the motion requesting that the mother's attorney be "terminated" and that the matter be "reassigned" to another attorney. The judge excused the jury for the day, and conducted a hearing on the motion. The mother's initial reaction: "Can I withdraw that? I assumed that it got destroyed. I didn't know it got mailed." The trial judge noted his admiration of the attorney's legal ability representing the rights of parents. The judge denied the mother's request to withdraw the motion, stating: "I'm ruling on the motion, the motion for appointment of counsel pro se motion is denied."
¶ 14 The mother contends that she was denied a fair trial when the trial court denied her motion. The argument is that "[w]ithout the benefit of the attorney/client relationship, a fair trial is impossible." We find the proposition of error does not have merit.
¶ 15 It is fundamental that the attorney-client relationship is one of the highest trust and requires that an attorney's dealings with his client must be characterized by the utmost candor and fairness. State ex rel. Oklahoma Bar Association v. Hatcher, 1969 OK 42, ¶ 19, 452 P.2d 150, 154. It is equally well settled that a trial court's mid-trial rulings will not be set aside on appeal absent an abuse of discretion or error as a matter of law. To reverse a trial court under an abuse-of-discretion standard, we must find that the trial court made a clearly erroneous conclusion against reason and evidence. Green Bay Packaging, Inc. v. Preferred Packaging, Inc., 1996 OK 121, 932 P.2d 1091.
¶ 16 In this matter, apparently the motion had not been properly filed, and therefore was not properly before the trial court for a ruling. Consequently, neither the motion nor supporting affidavit are part of the record on appeal. It is an appellant's obligation to provide us with a record sufficient to support her propositions of trial court error. From a silent record we must presume the trial judge did not err. The mother had not alleged ineffective assistance of counsel, nor has she alleged or demonstrated any prejudice as a result of the denial of the wayward motion. In City of Lawton v. Kelley, 1917 OK 116, 162 P. 1081, the Oklahoma Supreme Court held that a trial court's decision on an application to file a pleading out of time would not be reversed in the absence of an abuse of discretion. We find no abuse of the trial court's discretion.

V
¶ 17 We find no trial court error, and hold the jury's verdict and judgment entered thereon are supported by competent evidence. The judgment terminating the mother's parental rights is affirmed.
¶ 18 AFFIRMED.
¶ 19 STUBBLEFIELD, J., and REIF, J., concur.
NOTES
[1] M.B.'s treating physician testified that the diagnostic procedures included at least ten blood cultures, two spinal taps, two abdominal ultrasounds, a CT scan of the head, and MRI of the head, an EEG, a sleep study, a pH study, two echocardiograms, and endoscopy by the ear, nose and throat doctors, and two or three nasal pharyngeal washings.
[2] The statutory subsections cited by the State in its answer brief became effective after the last amended petition was filed June 5, 1997, and therefore could not serve as the legal basis for this proceeding to terminate parental rights.
[3] The condition is named after Baron Karl Friedrich von Munchausen, who lived from 1720 to 1797, and was a German hunter, soldier, and supposed teller of absurdly exaggerated stories.